JUDGE CROTTY

10 CV 2430

RECEIVED
MAR 17 2010
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GRANITE RIDGE ENERGY, LLC,                    :

                              Plaintiff,       :

                                               :        10 Civ_____
           -against-                           :        ECF Case (___)

                                               :
ALLIANZ GLOBAL RISK US INSURANCE               :        **COMPLAINT**
COMPANY, ASSOCIATED ELECTRIC & GAS             :
INSURANCE SERVICES, CONTINENTAL                :
INSURANCE COMPANY, THE HARTFORD STEAM          :        **JURY TRIAL**
BOILER INSPECTION AND INSURANCE                :        **DEMANDED**
COMPANY, LIBERTY MUTUAL INSURANCE              :
COMPANY, ACE AMERICAN INSURANCE                :
COMPANY, WESTPORT INSURANCE                    :
CORPORATION, and INDUSTRIAL                    :
RISK INSURERS,                                 :

                                               :
                              Defendants.       :
-----------------------------------------------------------------x

## PARTIES

1.      Plaintiff Granite Ridge Energy, LLC ("Plaintiff") is a limited liability company

organized under the laws of the State of Delaware with its principal offices in New Hampshire.

2.      Defendant Allianz Global Risk US Insurance Company ("Allianz") is a

corporation organized under the laws of the State of California with its principal offices in

Illinois.

3.      Defendant Associated Electric & Gas Insurance Services ("Associated Electric &

Gas") is a corporation organized under the laws of Bermuda with its principal offices in New

Jersey.

4.      Defendant Continental Insurance Company ("Continental") is a corporation

organized under the laws of the Commonwealth of Pennsylvania with its principal offices in

Illinois.

5.      Defendant The Hartford Steam Boiler Inspection and Insurance Company (Starr Tech) ("Starr Tech") is a corporation organized under the laws of the State of Connecticut with its principal offices in Connecticut.

6.      Defendant Liberty Mutual Insurance Company ("Liberty Mutual") is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal offices in Massachusetts.

7.      Defendant ACE American Insurance Company ("ACE") is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal offices in Pennsylvania.

8.      Defendant Westport Insurance Corporation ("Westport") is a corporation organized under the laws of the State of Missouri with its principal offices in Kansas.

9.      Defendant Industrial Risk Insurers ("IRI") is unincorporated association with its principal offices in Connecticut.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the action pursuant to 28 U.S.C. 1332(a)(3) as the amount in controversy exceeds $75,000 and there is diversity of citizenship between plaintiff and each of the defendants.

11.     Venue is proper under 28 U.S.C. § 1391(a)(3) one or more of the defendants is subject to personal jurisdiction in this district and there is no other district in the action may be brought.

11.     Plaintiff is the owner of a 720 megawatt power generation facility in Londonderry, New Hampshire and is the insured under binders of all-risks insurance issued by each of the defendants, effective on or about March 30, 2006.

2

12.    Plaintiff is an insured under All-Risks Insurance Binder ARS4480 ("Binder ARS4480") issued by defendants ACE, Allianz, Associated Electric & Gas, Continental, Liberty Mutual and Starr Tech on or about March 30, 2006. A true copy of All-Risks Binder ARS4480 is annexed as Attachment A.

13.    On information and belief, Plaintiff is an insured under all-risks binders of insurance issued by defendants Westport, on behalf of defendant IRI ("Binder ARS4478") and Associated Electric & Gas ("Binder ARS4479"), respectively, on or about March 30, 2006.

14.    On information and belief, the terms of Binders ARS4478 and ARS4479, are similar or identical to the terms of Binder ARS4480.

15. On information and belief, Binders ARS4478, ARS4479 and ARS4480 (the "All-Risks Binders") together insured plaintiff for $474,000,000 per occurrence, as set forth below:

**ARS4478**

| Westport on behalf of IRI | 15.00% of $50,000,000 per occurrence |
|---|---|

**ARS4479**

| Associated Electric & Gas | 15.00% of $374,000,000 per occurrence |
|---|---|

**ARS4480**

| Allianz | 15.00% of $424,000,000 per occurrence |
|---|---|
| Associated Electric & Gas | 10.00% of $424,000,000 per occurrence |
| Continental | 10.00% of $424,000,000 per occurrence |
| Starr Tech | 15.00% of $424,000,000 per occurrence |
| Liberty Mutual | 15.00% of $424,000,000 per occurrence |
| ACE | 20.00% of $424,000,000 per occurrence |

16. On April 6, 2006, while the All-Risks Binders were in effect, a severe electrical event (the "April 6 Electrical Event") at Plaintiff's facility caused direct damage and loss to Plaintiff's Siemens Westinghouse 501G Steam Turbine Generator (the "Generator") and ABB 231 MVA Transformer (the "Transformer"), used to transmit power from the Generator to the grid outside Plaintiff's Londonderry Facility.

17. On, or about May 9, 2006, Westport issued Policy ARS 4478 in the form annexed hereto as Attachment B.

18.     On May 9, 2006, Associated Electric & Gas issued Policy ARS 4479 in the form annexed hereto as Attachment C.

19.     On information and belief, on or about May 9, 2006, Insurers Allianz, ACE, Associated Electric & Gas, Continental, Starr-Tech and Liberty Mutual issued Policy ARS 4480 in the form annexed hereto as Attachment D.

## FACTUAL BACKGROUND

20.     By this action, Plaintiff seeks to recover amounts due from each of the Insurers under the All-Risks Binders for repair of the Generator and replacement of the Transformer as well as lost earnings attributed to the necessary interruption of Plaintiff's business during the periods required to remedy the damage and loss caused by the April 6 Electrical Event and restore Plaintiff's business to the condition that would have existed had no loss occurred.

### Plaintiff's Loss As A Result Of The April 6, 2006 Electrical Event

21.     On April 6, 2006, a severe electrical event occurred at Plaintiff's Londonderry facility.

22.     The April 6 Electrical Event caused direct physical loss and damage to the Generator and the Transformer.

23.     The April 6 Electrical Event was not a peril excluded under All-Risks Binders ARS 4478, 4479 and 4480.

24.     Plaintiff had an insurable interest in the Generator and the Transformer at the time of issuance of the All-Risks Binders and at the time of the April 6 Electrical Event.

25.     As a result of the April 6 Electrical Event, Plaintiff's business operations were interrupted from April 6, 2006 to July 19, 2006 (the "Generator Repair Period") and January 23, 2007 to April 11, 2007 (the "Transformer Replacement Period").

26.    At the time of the April 6 Electrical Event, the fact, if not the full extent, of the damage sustained to the Generator, as a result of that event, was apparent because that damage rendered the Generator inoperable.

27.    Plaintiff notified Insurers of the April 6 Electrical Event, and the damage and loss to the Generator, on or about April 7, 2006.

28.    Because Plaintiff could not operate its business without use of the Generator, the Transformer remained de-energized and out of operation during the Generator Repair Period.

29.    The damage and loss to the Transformer, which rendered it incapable of operation in a safe and satisfactory manner, did not manifest itself until periodic testing of the levels of dissolved combustible gases in the Transformer on or about November 11, 2006 revealed an accumulation of combustible gases indicative of a fault in the Transformer.

30.    The accumulation of certain dissolved combustible gases in the insulating oil of an oil-immersed transformer, such as the Transformer, during a period of operation is indicative of fault in the Transformer.

**Inspection, Maintenance And Testing Of The Transformer During**
**The Generator Repair Period**

31.    During the period that the Generator was unavailable and the Transformer remained de-energized and out of operation, Plaintiff requested that its servicer, Transformer Services, Inc. ("TSI"), perform maintenance on the Transformer.  Plaintiff also requested that Doble Engineering, Inc. inspect and test the Transformer to determine whether its dielectric circuit had been damaged by the April 6 Electrical Event.

32.    On or about April 10, 2006, TSI partially drained the Transformer insulating oil, collected a sample of the insulating oil and tested the sample for levels of dissolved combustible

gases. On or about April 13, 2006, TSI vacuum-filled the Transformer with 50 gallons of new insulating oil to the Transformer.

33.     On or about April 17, 2006, Doble inspected the Transformer and performed a series of electrical tests. The results of the tests performed by Doble in mid-April 2006 did not indicate any impairment to the Transformer dielectric circuit.

**Disassembly, Repair And Reassembly Of The Generator**

34.     After consultation with Insurers adjuster, Plaintiff engaged Siemens Power Generation, Inc. to disassemble, inspect and repair the damage sustained by the Generator as a result of the April 6 Electrical Event.

35.     The repair of the Generator required, among other things, removal of the Generator rotor and partial disassembly and flushing of the Generator hydrogen seal oil system ("the H2 Seals"). During regular operation of the Generator, the H2 Seals form a barrier between outside air and the hydrogen gas environment surrounding the rotor.

36.     Prior to the April 6 Electrical Event, the Generator, including the H2 Seals, had been operating satisfactorily with an end-to-end pressure differential within the range specified for safe operation of the Generator.

37.     The repair and restoration of the Generator to service in Plaintiff's business required, among other things, reinstallation of the rotor, reassembly of the H2 Seals, including refilling of the seal oil system, and various tests to ensure that the reassembled Generator was operating properly and within specifications before its return to commercial service.

38.     On or about July 7, 2006, Siemens conducted a 70 MW start-up test of the reassembled Generator to determine whether the Generator was fit to be returned to service (the

"July 7 Generator Start-Up Test"). During its operation in commercial service, the Generator operates with an output of 200 MW or greater.

39.     During the course of the July 7 Generator Start-Up Test, Siemens noted that the end-to-end pressure differential in the Generator seal oil system exceeded specifications. Siemens advised Plaintiff that correction of the unacceptable end-to-end pressure differential required further investigation and possible replacement of the H2 Seal rings. Siemens further advised Plaintiff that operation of the Generator with an end-to-end pressure differential in excess of specifications presented a substantial risk of damage to the Generator.

40.     Siemens also informed Plaintiff that replacement rings for the Generator H2 Seal would only be available through Siemens on or about July 24, 2006.  Plaintiff advised Siemens that it would have a new seal ring machined by Pioneer Bearing, Inc. on an expedited basis and requested that Siemens disassemble the H2 Seals and advise Pioneer of precise dimensions required for the replacement seal ring.

41.     On July 8, 2006, Plaintiff requested that Pioneer Bearing, Inc. commence the machining of a replacement seal ring for the Generator and await Siemens' advice as to the final dimensions required.

42.     Siemens partially disassembled the Generator collector-end hydrogen seal, measured the seal ring radial clearance and determined that the radial clearance for the collector-end seal ring exceeded specifications. On or about July 15, 2006, Siemens advised Pioneer Bearing of the required dimensions for final machining of the replacement seal ring.

43.     On or about July 17, 2006, Pioneer Bearing shipped the replacement seal ring for delivery on July 18, 2006.

44.     Also on July 17, 2006, during disassembly of the H2 Seals in preparation for installation of the replacement ring, Siemens found, and removed, a rubber o-ring from an area in or around the H2 Seal ring groove.

45.     Between July 18, 2006 and July 19, 2006, Siemens completed its installation of the replacement seal ring.

46.     On or about July 19, 2006, Siemens restarted the Generator and confirmed that it was operating within specification and was ready to be returned to service.

47.     The Generator and the Transformer were returned to service in Plaintiff's business that same day, both for the first time since the April 6 Electrical Event.

**Manifestation Of Damage To The Transformer As A Result Of The April 6 Electrical Event**

48.     On or about November 11, 2006, TSI performed the first analysis of the level of dissolved combustible gases in the Transformer insulating oil since the Transformer was restored to operation after the April 6 Electrical Event.  TSI had performed dissolved gas analyses at approximately semi-annual intervals since March 2003, when Plaintiff first acquired the Transformer, as part of regular maintenance of the Transformer.

49.     The accumulation of certain amounts of dissolved combustible gas in the insulating oil of an oil-cooled Transformer, during a period of operation is recognized as a reliable indicator of the occurrence fault by, among others, the U.S. Dept. of the Interior and the International Electrotechnical Commission.  In a publication entitled FIST 3-30 (Facilities Instructions, Standards and Techniques, Transformer Maintenance) ("FIST 3-30"), the U.S. Department of the Interior provides guidance for assessing the operating condition of a transformer based on the amount, and rate of accumulation, of certain combustible gases, individually and in the aggregate, in the Transformer insulating oil.

9

50.    Levels, or rates of accumulation, of dissolved combustible gases below the upper limit of a range defined in FIST 3-30 as Condition 1 are considered to indicate that a Transformer is operating satisfactorily.  Levels, or rates of accumulation, above that threshold but below the upper limit of the range defined in FIST 3-30 as Condition 2 are considered to indicate a possible fault in the Transformer.

51.    Levels, or rates of accumulation above the upper limit of the range defined as Condition 2 but below the upper limit of the range defined in FIST 3-30 as Condition 3 threshold are considered to indicate a probable fault in the Transformer.  Transformers that exhibit dissolved combustible gas levels, or rates of accumulation, exceeding the upper limit of Condition 3 are classified in FIST 3-30 as operating in Condition 4.  Condition 4 levels are considered to warrant consideration of removal of an affected Transformer from service.

52.    Each of the dissolved gas analyses performed by TSI prior to the November 11, 2006 analysis indicated that the Transformer was operating in Condition 1 and at the most favorable end of the range specified as Condition 1 in FIST 3-30.

53.    The November 11, 2006 dissolved gas analysis (the "November 11, 2006 DGA") indicated a dissolved combustible gas level that placed the Transformer in the range identified as Condition 4 in FIST 3-30.

54.    In consideration of the adverse results of the November 11, 2006 DGA, TSI tested the Transformer insulating oil again on January 9, 2007 (the "January 9, 2007 DGA").  The January 9, 2007 sample of the Transformer insulating oil reflected an escalation in the amount of dissolved combustible gas in the Transformer insulating oil.  The January 9, 2007 DGA reflected that the levels of the dissolved combustible gases, ethane and methane, had reached the range of Condition 3, as defined in FIST 3-30.

55.     Upon learning the results of the January 9, 2007 DGA, Plaintiff contacted Doble and requested its analysis of the dissolved combustible data from the November 11, 2006 DGA and the January 9, 2007 DGA.  Doble reviewed that data and concluded that it indicated high temperature overheating of the Transformer insulating oil.

56.     On January 17, 2007, TSI analyzed another sample of the Transformer insulating oil (the "January 17, 2007 DGA").   The January 17, 2007 sample reflected further escalation in the level, and rate of accumulation, of dissolved combustible gas during the period January 9, 2007 to January 17, 2007.

57.     On or about January 18, 2007, Doble analyzed a sample of the Transformer insulating oil drawn on January 18, 2007 (the "January 18, 2007 DGA") and concluded that the levels of dissolved combustible gas in the January 18, 2007 sample indicated a severe overheating condition in the Transformer.

58.     On January 21, 2007, TSI analyzed another sample of the Transformer insulating oil (the "January 21, 2007 DGA").  The January 21, 2007 sample indicated further escalation in the level, and rate of accumulation, of dissolved combustible gas over the period January 17, 2007 to January 21, 2007.

59.     On or about January 23, 2007, Doble advised Plaintiff that continued operation of the Transformer presented a substantial risk of imminent and catastrophic failure, including explosion, fire and the potential for collateral damage to equipment and operators at the Londonderry Power Generation Facility.  On Doble's recommendation and advice, Plaintiff withdrew the Transformer from service.

60.     The withdrawal of the Transformer from service resulted in the necessary interruption of Plaintiff's business between January 23, 2007 and April 11, 2007.

61.    Between January 24, 2007 and January 27, 2007, Doble and ABB conducted internal and external visual inspection of the Transformer. Doble also performed a series of electrical tests on the Transformer and concluded that the tests did not suggest a problem with the Transformer dielectric circuit. However, Doble reiterated its conclusion that the DGA results indicated that the Transformer should not be returned to service.

62.    Upon conclusion of its inspection of the Transformer, ABB concluded that remediation of the fault responsible for the dissolved combustible gas levels required replacement of the Transformer windings and insulation. ABB estimated the cost of remediation of the Transformer to be between $1.7 million and $2.2 million, excluding the cost of off-site transportation. ABB estimated the repair time to be between 9 and 11 months.

63.    After considering the ABB proposal, Plaintiff advised Insurers of its intention to purchase a replacement transformer at a cost of approximately $2.7 million and to sell the Transformer for salvage.

64.    Insurers did not object to Plaintiff's proposal to replace the Transformer and to sell it for salvage upon its scheduled decommissioning in May 2007.

65.    Over the two-day period from May 17, 2007 to May 18, 2007, and with notice to Insurers, the Transformer was decommissioned, inspected by Doble and Insurers' expert at Plaintiff's Londonderry Power Generation Facility and sold for salvage.

66.    Scott S. Cramer, P.E., of Engineering Design & Testing Corp. attended the decommissioning and salvaging of the Transformer on behalf of the Insurers.

**Insurers' November 2, 2007 Denial Of Coverage For The Cost Of
Replacement Of The Transformer And Plaintiff's Lost Gross Earnings
During The Transformer Replacement Period**

67.     On or about November 2, 2007, Insurers declined coverage under the All-Risks

Policy for the loss to the Transformer, and Plaintiff's lost gross earnings attributable to the

interruption of its business during the Transformer Replacement Period, on the basis of Insurers'

assertion that the Transformer had not sustained physical loss or damage within the meaning of

the All-Risks Policy as a result of the April 6, 2006 Electrical Event or otherwise.

68.     On or about August 9, 2009, more than two years after Plaintiff's disposition of

the Transformer on notice to the Insurers upon decommissioning and inspection by Insurers'

expert, Insurers purported to supplement their November 2, 2007 declination of coverage by

asserting that, insofar as the Transformer sustained physical loss or damage, coverage was barred

by exclusions in the All-Risks Policy applicable to loss or damage resulting from "faulty or

defective workmanship, material, construction or design" and "gradual deterioration, depletion,

rust or corrosion, wear and tear, wet or dry rot, inherent vice or latent defect."

**Insurers' May 15, 2008 Denial Of Coverage For The Cost Of Replacement
Of The H2 Seals And Lost Gross Earnings During The Portion Of The
Generator Repair Period From July 6, 2006 To July 20, 2006**

69.     On or about May 19, 2008, Insurers' wrote Plaintiff and declined cover for the

cost of replacement of the H2 Seals, and the portion of the Generator Repair Period from July 6,

2006 to July 20, 2006, on the basis of Insurers' assertion that the excessive end-to-end pressure

differential in the H2 Seals observed during the July 6, 2006 start-up test of the Generator did not

arise out of the April 6 Electrical Event that caused the generator outage.

**Insurers' Refusal To Indemnify GRE For The Disputed Portion Of**
**The Loss Caused By The April 6 Electrical Event**

70.     Insurers have failed and refused to indemnify Plaintiff for the following components of its loss as a result of the April 6 Electrical Event:  (i) the $53,242.91 cost of remediation of the unacceptable end-to-end pressure differential in the H2 Seals; (ii) $3,630,012.21 in lost gross earnings in respect of the July 7, 2006 to July 19, 2006 period required for remediation of the excessive end-to-end pressure differential in the H2 Seals; (ii) the $5,804,440 cost of replacement of the Transformer, including transportation, labor and related costs; and (iv) $14,718,444 in lost gross earnings caused by the interruption of Plaintiff's business during the Transformer Replacement Period.

**COUNT I**

**(BREACH OF CONTRACT-THE ALL-RISKS BINDERS)**

71.     Plaintiff hereby incorporates the allegations set forth in numbered paragraphs 1 through 70 of the complaint.

72.     The All-Risks Binders are contracts between Plaintiff and each of the issuing Insurers.

73.     The All-Risks Binders were each in effect on the date of the April 6 Electrical Event.

74.     Plaintiff performed all of its obligations under the All-Risks Binders.

75.     Insurers have each failed and refused to indemnify Plaintiff for physical loss and damage to the Transformer, and to fully indemnify Plaintiff for physical loss and damage to the Generator, directly caused by the April 6 Electrical Event and for lost gross earnings caused by the interruption of Plaintiff's business during the portion of the Generator Repair Period, from

14

July 7, 2006 to July 19, 2006, and the Transformer Replacement Period as required by the All-Risks Binders.

76.    Each of the issuing Insurer's failure and refusal to indemnify Plaintiff constitutes a breach of the All-Risks Binder or Binders.

77.    Plaintiff has been damaged as a result of each Insurer's breach of the All-Risks Binder or Binders.

## COUNT II

### (IN THE ALTERNATIVE TO COUNT I
### BREACH OF CONTRACT-THE ALL-RISKS POLICY)

78.    Plaintiff hereby incorporates the allegations set forth in numbered paragraphs 1 through 77 of the complaint.

79.    All-Risks Policies ARS 4478, 4479, and 4480 ("the All-Risks Policies") are, to the extent consistent with the corresponding Binders, each a contract between Plaintiff and each of the participating Insurers, with effect from their respective date or dates of issuance and delivery to Plaintiff.

80.    In the event it is determined that one or more of the All-Risks Policies were delivered to Plaintiff on or before the occurrence of the April 6 Electrical Event, or were otherwise in effect at the time of the April 6 Electrical Event, the participating Insurers have each failed and refused to fully indemnify Plaintiff for physical loss and damage to the Transformer and to fully indemnify Plaintiff for physical loss and damage to the Generator, directly caused by the April 6 Electrical Event and for lost gross earnings caused by the interruption of Plaintiff's business during the portion of the Generator Repair Period, from July 7, 2006 to July 19, 2006, and the Transformer Replacement Period as required by the All-Risks Policy.

81.    Plaintiff performed all of its obligations under the All-Risks Policies.

15

82.     Each of the issuing Insurer's failure and refusal to indemnify Plaintiff constitutes a breach of the All-Risks Policy or Policies issued by that Insurer.

83.     Plaintiff has been damaged as a result of each Insurer's breach of the All-Risks Policy or Policies issued by that Insurer.

## COUNT III

## (BAD-FAITH DENIAL OF COVERAGE)

84.     Plaintiff hereby incorporates the allegations set forth in numbered paragraphs 1 through 83 of the complaint.

85.     Each of the Insurers has a duty of good faith and fair dealing toward the Plaintiff that is independent of their contractual obligation to Plaintiff under the All-Risks Binders or, in the alternative, the All-Risks Policy.

86.     Each of the Insurers has, in violation of its duty of good faith, declined coverage for the disputed portion of Plaintiff's loss in bad faith and without any reasonable basis in law or fact.

87.     Plaintiffs have been damaged, and will be damaged further, as a result of each Insurer Defendants' bad-faith denial of coverage for the disputed portion of Plaintiff's claim insofar as Plaintiff has incurred, and will continue to incur, attorney's fees and litigation costs in order to recover amounts due it under the All-Risks Policy.

WHEREFORE, Plaintiff demands judgment:

(i)     awarding damages against Allianz in the amount of $3,630,920.85, representing 15% of $24,206,134.00 in respect of Count I, or, in the alternative, Count II, of the Complaint and further damages,  in an amount equal to 15% of

the attorney fees and litigation costs incurred by Plaintiff in prosecution of this action, in respect of Count III of the Complaint;

(ii)    awarding damages against Associated Electric & Gas in the amount of $2,420,613.40, representing 10% of $24,206,134.00 in respect of Count I, or, in the alternative, Count II of the Complaint and further damages, in an amount equal to 10% of the attorney fees and litigation costs incurred by Plaintiff in prosecution of this action, in respect of Count III of the Complaint;

(iii)    awarding damages against Starr Tech in the amount of $ 3,630,920.85, representing 15% of $24,206,134.00 in respect of Count I, or in the alternative, Count II, of the Complaint and further damages, in an amount equal to 15% of the attorney fees and litigation costs incurred by Plaintiff in prosecution of this action, in respect of Count III of the Complaint;

(iv)    awarding damages against Continental in the amount of $2,420,613.40, representing 10% of $24,206,134.00 in respect of Count I, or in the alternative, Count II, of the Complaint and further damages,  in an amount equal to 10% of the attorney fees and litigation costs incurred by Plaintiff in prosecution of this action, in respect of Count III of the Complaint;

(v)    awarding damages against Liberty Mutual in the amount of $3,630,920.85, representing 15% of $24,206,134.00 in respect of Count I, or in the alternative, Count II, of the Complaint and further damages, in an amount equal to 15% of the attorney fees and litigation costs incurred by Plaintiff in prosecution of this action, in respect of Count III of the Complaint;

(vi)    awarding damages against ACE in the amount of $4,841,226.80, representing 20% of $24,206,134.00 in respect of Count I, or in the alternative, Count II of the Complaint and further damages, in an amount equal to 20% of the attorney fees and litigation costs incurred by Plaintiff in prosecution of this action, in respect of Count III of the Complaint;

(vii)    awarding damages, jointly and severally, against Westport and IRI in the amount of $3,630,920.85, representing 15% of $24,206,134.00 in respect of Count I, or, in the alternative, Count II, of the Complaint and further damages, in an amount equal to 15% of the attorney fees and litigation costs incurred by Plaintiff in prosecution of this action, in respect of Count III of the Complaint;

(viii)    pre-judgment interest at the statutory rate; and

(ix)    such other and further relief as the Court deems proper.

Dated:        New York, New York
              March 17, 2010

                        HARGRAVES McCONNELL & COSTIGAN, P.C.


                        _____
                        John P. McConnell (JM-0752)
                        Stephanie Dersch (SD-7103)
                        The Graybar Building
                        420 Lexington Avenue
                        New York, New York 10170
                        Tel. No.: 212-218-8760

                        Counsel for Plaintiff Granite Ridge Energy, LLC

                                    19