USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 21, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                               :

GRANITE RIDGE ENERGY, LLC,            :

                               :

           Plaintiff,             :

                               :

      -against-               :

                               :         10 Civ. 2430 (PAC)

ALLIANZ GLOBAL RISK US INSURANCE  :

COMPANY, ASSOCIATED ELECTRIC &   :

GAS INSURANCE SERVICES,           :         OPINION & ORDER

CONTINENTAL CASUALTY COMPANY,    :

THE HARTFORD STEAM BOILER       :

INSPECTION AND INSURANCE          :

COMPANY, LIBERTY MUTUAL           :

INSURANCE COMPANY, ACE             :

AMERICAN INSURANCE COMPANY, and  :

INDUSTRIAL RISK INSURERS,        :

                               :

           Defendants.        :

                               :

-------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

This is an insurance coverage dispute brought by Plaintiff Granite Ridge Energy, LLC

pursuant to several "all risk" policies issued by the Defendant insurers.  Plaintiff's claims arise

out of damages to its electrical generator and transformer at its power plant in Londonderry, New

Hampshire.  The Court presumes familiarity with the facts as set forth in its prior opinion

granting Plaintiff summary judgment on liability for damages to the generator and granting

Defendants' cross-motion on liability for damages to the transformer.  (*See* ECF No. 105.)[1]

Thereafter, the parties submitted opposing memoranda on damage calculations.  The

_____

[1] The Court also subsequently denied the parties' motions for reconsideration of the Court's order on summary
judgment.  (ECF No. 116.)

Court construes these submissions under the same summary judgment standard.  As set forth

below, the Court GRANTS summary judgment to Plaintiff for damages in the amount of

$3,404,347.91, plus pre-judgment interest to be calculated pursuant to N.Y. C.P.L.R. §§ 5001–

02, starting on July 24, 2007, at the rate of nine percent per annum.  That amount includes

$53,242.91 in damages to the generator and $3,351,105 in business interruption losses.

## BACKGROUND[2]

It is undisputed that Defendants are liable for $53,242.91 in unindemnified repair costs

for Plaintiff's generator.  (Def.'s Br. 1.)  What is in dispute is the amount of Defendants' liability

for (1) Plaintiff's business interruption loss for the period of July 7 through July 19, 2006

("Disputed Period") and (2) prejudgment interest for these amounts.

With respect to the business interruption loss, Plaintiff claims $3,351,105 in damages,

while Defendants calculate their liability to be only $3,298,819.  The $52,286 difference

represents a dispute over (a) a "variance" of $40,301 in Plaintiff's damages model as calculated

by the Defendants' expert, Buchanan Clarke Schlader LLP ("BCS"); and (b) an additional

reduction of $11,985 that Defendants propose on the basis that "BCS realized" at its deposition

on July 26, 2011 that there had been a mistake in the model regarding "water and chemicals"

data.  (Defs.' Br. 7–8.)[3]  Nevertheless, on October 28, 2011, Defendants asserted in their

---

[2] The facts described herein are either undisputed or represent reasonable inferences drawn in favor of Defendants, unless otherwise noted.

[3] These are the amounts in dispute with respect to the model's calculations, although the BCS report contains some arithmetic that is, at best, confusing.  For instance, the report states that "we calculate the model variance (based upon the 1.211% rate) of $40,595.  Subtracting the model variance of $40,595 from the lost gross margin of $3,351,105 yields a business interruption loss for the period July 7 through 19, 2006 of $3,310,804."  (Buchanan Decl. Ex. A at 3.)  But 1.211% (the variance rate) of $3,351,105 (the model's calculated loss) is not $40,595.  (It is $40,582.)  And subtracting $40,595 from $3,351,105 does not equal $3,310,804.  (It is $3,310,510.)  Notwithstanding these small arithmetical discrepancies, there is no dispute that the difference between the parties' positions on the business interruption loss is $52,286.  Of that amount, $40,301 is attributable to BCS's proposed

counterstatement of undisputed material facts[4] that Plaintiff's business interruption loss was $3,310,804, which did not account for the purported error regarding "water and chemicals" that previously had been discovered.  (Defs.' R. 56.1 Counterstatement ¶ 85.)[5]

As for the disputed "variance" in the damages model,[6] BCS's report asserts that a reduction to the model's projected loss amount was justified in light of a comparison between "the model results [and] actual results during the period January through March 2006." (Buchanan Decl. Ex. A at 3.)  BCS concluded that the difference between the model's projected income figures and the actual amount for that period should be used to calculate a "variance" to be deducted from the model's projected amount for the Disputed Period.  (*Id.*)  Defendants characterize this analysis as "a very simple, common sense test" of the model.  (Defs.' Br. 8.)

BCS's report itself does not explain the rationale for selecting those three months as the basis for comparison.  Defendants' brief, however, avers that BCS chose that time period essentially by process of elimination:  Plaintiff objected to using data from *prior* months in 2005 because Plaintiff "had been using a different model" then, and Plaintiff objected to using data from *subsequent* months in 2006 due to problems with its transformer that affected the plant's output.  (Defs.' Br. 8.)  Thus, BCS was left with only data from the months of January through March 2006 to test the model.  Notwithstanding the variance that it calculated from this test,

---

model variance (by subtracting BCS's final calculation, $3,310,804, from the model's calculated amount, $3,351,105).  The remainder, $11,985, is attributable to the dispute over the "water and chemicals" data.

[4] *See* Local Civ. R. 56.1(b).

[5] Defendants notified Plaintiff of the error regarding the water and chemicals data by email on August 16, 2011.

[6] The parties agree that certain adjustments to a prior version of the model were necessary, which are apparently unrelated to the disputed "variance" discussed herein.  (Pl.'s Op. Br. 4; Defs.' Opp'n 6.)  To avoid confusion, references herein to the "model" are to the agreed-upon "Adjusted Model."  (*See id.*)  The "variance" to *that* model is what is in dispute here.

BCS concluded that "it appears reasonable to utilize" the model to calculate Plaintiff's business interruption loss.  (Buchanan Decl. Ex. A at 3.)

A far more significant dispute exists with regard to the calculation of prejudgment interest.  The parties differ on which state's law applies and when interest started to accrue, and the resolution of these two issues has a substantial monetary impact.[7]  Plaintiff contends that New York law applies because the insurance policies provide that they "shall be interpreted solely according to the laws of New York."  Defendants do not dispute that the policies so provide, but they counter that those provisions specify only which law governs the interpretation of the policies' terms, not which law would govern an award of prejudgment interest.  (*See* Defs.' Br. 12.)  Instead, Defendants argue that New York's general conflict-of-laws analysis indicates that New Hampshire's substantive law applies because that state is the "center of gravity" of the dispute and has the "most significant contacts" with it.  (*Id.* at 9.)

The parties also identify several dates of potential relevance to the determination of when interest started to accrue.  Plaintiff's generator was returned to service on July 20, 2006.  (Defs.' R. 56.1 Counterstatement ¶ 27.)[8]  Defendants denied Plaintiff's claim for the disputed property damages and business interruption losses on at least three occasions: (1) on July 24, 2007;[9] (2)

---

[7] If, as Plaintiff suggests, (1) the total losses at issue amount to more than $3.4 million, (2) the New York rate of nine percent per year applies, and (3) interest began to accrue on July 19, 2006; then more than $2.1 million of interest would have accrued by that date of this year.  On the other hand, in one of Defendants' proffered scenarios, no interest would have accrued at all under New York law.  That $2.1 million dispute over prejudgment interest dwarfs the $52,286 dispute as to the underlying damages.

[8] Although Plaintiff asserts in its brief that the generator was returned to service on the previous day, July 19 (Pl.'s Op. Br. 9), it is bound by its prior statement of undisputed material facts indicating that the date was July 20 (*see* Pl.'s R. 56.1 Stmt. ¶ 81).

[9] Defs.' R. 56.1 Stmt. ¶¶ 29, 32 (citing Reilly Decl. Ex. W (adjuster letter stating that "the generator outage event, and the oil seal issue involving the liberated O-rings, are unrelated")).

on May 19, 2008;[10] and (3) on April 8, 2009.[11]  Defendants state that Plaintiff "clearly defin[ed]

the nature and extent of its claim" on February 24, 2009 (Defs.' Br. 17) and made a "sufficient

demand for payment" on November 25, 2009 (Defs.' Br. 13).

## DISCUSSION

### I.      Summary Judgment Standard

Although the parties have not styled their submissions on damages as motions for

summary judgment, the Court will review them under the summary judgment standard in order

to determine whether any triable issue remains.  *Cf. Oscar Gruss & Son, Inc. v. Hollander*, 337

F.3d 186, 196 (2d Cir. 2003) ("Although the amount of recoverable damages is a question of

fact, the measure of damages upon which the factual computation is based is a question of law.")

(internal quotation marks omitted).

"Summary judgment is appropriate when, construing the evidence in the light most

favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law.'"  *Rojas v. Roman Catholic Diocese of*

*Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  A fact is material if

it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Id.*  The moving party bears the initial

burden of producing evidence on each material element of its claim or defense demonstrating

that it is entitled to relief.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The evidence

---

[10] Defs.' R. 56.1 Counterstatement ¶ 87 (citing Callaghan Decl. Ex. W (adjuster letter stating that "[t]he Oil Seal Issue did not 'arise out of' the April 6, 2006 Generator outage")).

[11] Defs.' Opp'n 3 (citing Vaughn Decl. Ex. H (adjuster letter stating that "[t]he Insurers stand by their May 19, 2008 position")).

on each material element must be sufficient to entitle the movant to relief as a matter of law. *Vt.*

*Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine dispute of material

fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory

allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,

315 F.3d 171, 175 (2d Cir. 2003), but must instead present specific evidence in support of its

contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(c). The Court

resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if

there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing

Fed. R. Civ. P. 56(c)). The same standard of review applies when the court is faced with cross-

motions for summary judgment. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir.

2001). Each party's motion must be reviewed on its own merits, and the Court must draw all

reasonable inferences against the party whose motion is under consideration. *Id.*

## II.     Analysis

As an initial matter, two portions of the damages calculation are readily ascertainable.

First, as noted above, the parties now agree that Defendants are liable for $53,242.91 in

unindemnified repair costs for the generator. Second, although Defendants seek a reduction of

$11,985 from Plaintiff's model on the grounds that it contained an error concerning "water and

chemicals" data, they have waived this argument. Defendants are bound by their Rule 56.1

counterstatement that Plaintiff's business interruption loss amounted to $3,310,804, which does

not account for this purported error. *See Cohan v. Movtady*, 751 F. Supp. 2d 436, 443 (E.D.N.Y.

2010) ("[P]arties are bound by their concessions in Rule 56.1 Statements.") Indeed, Defendants

have no cause to change their position now because they filed this counterstatement with the

Court more than three months after their expert discovered the error at its deposition, and more than two months after Defendants themselves raised the issue with Plaintiff.

### A.    The Disputed Model "Variance"

All that remains in dispute regarding the underlying losses is the $40,301 "variance" to the model for calculating the business interruption loss.  Defendants do not dispute that it is "reasonable" to use the model to calculate damages; indeed, the current model already reflects agreed-upon adjustments.  Nonetheless, Defendants press for a "variance" to the model's calculation for the Disputed Period on the basis that the model's projections for a *different* period (January through March 2006) were slightly lower than the actual results for that period.

Any proposed expert evidence must be "the product of reliable principles and methods . . . reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied . . . .'"  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Thus, the Court has the discretion—and obligation—to exclude expert evidence that it determines are based on unreliable methods.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) ("[A] district court must serve as a gatekeeper."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997) (holding that "a trial court's decision to admit or exclude expert testimony" is reviewed for "abuse of discretion").  In discharging this responsibility, a court may exclude an expert's testimony as to some issues but permit it as to others.  *See, e.g.*, *Liberty Media Corp. v. Vivendi Universal, S.A.*, 874 F. Supp. 2d 169, 177 (S.D.N.Y. 2012); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 285 (S.D.N.Y. 2010).

Here, Defendants' expert, BCS, gave no rationale in its report for why the data from

January through March 2006 was a reliable basis on which to make a downward variance to the

model for the Disputed Period.  Nor does BCS explain its basis for concluding that subtracting

the model variance amount from the model's calculation more accurately reflects the true losses

that Plaintiff suffered.  Although the report is less than clear on its rationale, the variance appears

to demonstrate nothing more than that the model slightly overestimated output during January

through March 2006—not that the model was consistently biased toward overestimating outputs

in general or for the Disputed Period in particular.  Indeed, the report gives no reason to believe

that the model would not have *under*estimated output for the Disputed Period.

Though Defendants may be right that the variance calculation was "a very simple,

common sense test" for the general accuracy of the model, they have not adduced evidence that

the variance was a reliable method to *change* the model's damages calculation for the Disputed

Period.  Accordingly, the Court excludes BCS's testimony regarding the variance as unreliable.

Since the concededly "reasonable" model remains as the only evidence of the business

interruption loss, there is no dispute of material fact that the loss is $3,351,105, as the model

indicates.

### B.    Calculation of Prejudgment Interest

The largest dispute deals with prejudgment interest.  Defendants contend that a lower

interest rate under New Hampshire law applies, but that even if New York law applied, interest

never began to accrue because Plaintiff has not submitted a sufficient proof of loss. Plaintiff, on

the other hand, contends that the higher rate under New York law applies and that interest began

to accrue no later than the date on which its generator was returned to service.  Neither party is

correct.

### 1.      New York Law Applies

"In a diversity case, state law governs the award of prejudgment interest."  *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008).  "To determine which state's law applies, a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits."  *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  New York law provides that, "[a]s a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored.  It is as though the law of the selected jurisdiction were incorporated into the agreement by reference."  *Freedman v. Chem. Const. Corp.*, 372 N.E.2d 12, 15 (N.Y. 1977).

Here, however, the parties' express intention to have the insurance policies "interpreted" according to New York law does not fully resolve the matter.  As Defendants point out, the question is not which law governs the *interpretation* of the policies and liability for breach, but which law determines any *additional* liability for prejudgment interest.  Therefore, the Court must consult New York's conflict-of-laws principles to determine which substantive law applies under these circumstances.

Before 1985, New York law appeared to be clear that in all cases, "allowance of pre-judgment interest is controlled by the rule of the jurisdiction whose law determines liability."  *Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 131 (2d Cir. 1984).  But in that year, the New York Court of Appeals announced a new rule for conflict-of-laws analysis in tort cases, making a distinction between substantive state laws that are "loss-allocating" and those that are "conduct-regulating."  *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 686 (N.Y. 1985).  There, the court held that for conduct-regulating laws such as "rules of the road," "the law of the

place of the tort will usually have a predominant, if not exclusive, concern," while for loss-

allocating laws such as those governing damages, the analysis favors applying "the jurisdiction

of common domicile" of the parties.  *Id.* at 684–85; *see also Cooney v. Osgood Mach., Inc.*, 612

N.E.2d 277, 280 (1993) ("If conflicting conduct-regulating laws are at issue, the law of the

jurisdiction where the tort occurred will generally apply . . . . But if competing 'postevent

remedial rules' are at stake other factors are taken into consideration, chiefly the parties'

domiciles.").

Recognizing this distinction, the Second Circuit subsequently held that "[p]rejudgment

interest, like other damages issues, is an aspect of loss-allocation" and therefore that the bright-

line rule in *Entron* was no longer valid.  *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 59 (2d Cir.

2000).[12]  In other words, after *Schultz*, the law governing the determination of liability in a

dispute does not necessarily govern the determination of prejudgment interest.  In so holding, the

Second Circuit distinguished a decision it issued the prior year (also well after *Schultz*) in which

it held that "the defendant's consent to the application of New York law to the determination of

liability" meant that New York law also governed the award of prejudgment interest.  *Id.* (citing

*Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)).[13]  Given that consent, the

---

[12] The Court notes that Plaintiff's reply brief cites *Entron* as good law and fails to cite *Caruolo*, which clearly overruled *Entron*'s general statement in light of *Schultz*.

[13] The court in *Caruolo* explained that "*Schwimmer*'s holding turned on: (i) the defendant's consent to the application of New York law to the determination of liability; and (ii) the defendant's 'fail[ure] to bring to the attention of the district court the potential applicability of Florida law to the issue of prejudgment interest.'" *Caruolo*, 226 F.3d at 59.  Although it is unclear from *Caruolo* whether both elements were necessary to waive application of the normal conflict-of-laws rule, the *Schwimmer* opinion itself indicates that consent to the application of a jurisdiction's law alone was sufficient to trigger the application of that jurisdiction's law to prejudgment interest.  *See Schwimmer*, 176 F.3d at 650 ("[Defendant] waived this argument by consenting to the application of New York law to the determination of liability in this case. . . . [Defendant] also waived its argument by failing to bring to the attention of the district court the potential applicability of Florida law to the issue of prejudgment interest.").

*Caruolo* court held, "the court in *Schwimmer* had no opportunity to consider whether, under New York law, prejudgment interest should be treated like all other loss-allocating damages issues." *Id.*

Indeed, consent is a particularly significant distinction in cases where, as in *Schwimmer*, the claims sound in *contract* rather than tort, *see Schwimmer*, 176 F.3d at 650 (insurance coverage dispute).  That is because "[u]nder New York law there are two different 'choice-of-law analyses, one for contract claims, another for tort claims.'"  *GlobalNet Fin. Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 383 (2d Cir. 2006); *see, e.g.*, *Ackerman v. Price Waterhouse*, 683 N.Y.S.2d 179, 188 (App. Div. 1st Dep't 1998) (explaining the distinctions); *Eagle Ins. Co. v. Singletary*, 717 N.Y.S.2d 351, 352 (App. Div. 2d Dep't 2000) ("This conflict of law . . . must be resolved by the conflict of law rules relevant to contracts, not torts.").  Thus, where the "consent" concerning which law will apply takes the form of a contractual agreement, "it is the policy of the courts of [New York] to enforce that choice of law" absent certain relatively rare exceptions.  *See Finucane v. Interior Const. Corp.*, 695 N.Y.S.2d 322, 324–25 (App. Div. 1st Dep't 1999); *see also Freedman*, 372 N.E.2d at 15 n.*.

The *Restatement (Second) of Conflict of Laws* provides that where parties have validly chosen a state's law "to govern their contractual rights and duties," that same state's substantive law will govern "[t]he measure of recovery for a breach of contract."  §§ 187, 207.  That measure of recovery includes "whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period between the breach of contract and the rendition of judgment."  *Id.* § 207 cmt. e.

Although the Court is unaware of any other court having held that this particular rule is incorporated into New York law, New York courts routinely refer to the Second Restatement as

authority for conflict-of-laws principles governing contracts.  *E.g.*, *IRB-Brasil Resseguros, S.A. v. Inepar Investments, S.A.*, 982 N.E.2d 609, 612 (N.Y. 2012); *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 501 (N.Y. 2006); *Freedman*, 43 N.Y.2d at 265; *Finucane*, 695 N.Y.S.2d at 324.  *See generally* 19A N.Y. Jur. 2d *Conflict of Laws* § 33 *et seq.* (repeatedly citing the Second Restatement as authority).  Accordingly, the Court will apply the Second Restatement's rule that where the parties have validly chosen a state's law to govern the interpretation of their contract, that same law will determine the award of prejudgment interest.

This rule is not inconsistent with the holding of the New York Court of Appeals in *Schultz*, nor is the Second Circuit's interpretation of it in *Caruolo* to the contrary.  *Schultz*'s distinction between loss-allocating rules and conduct-regulating rules was expressly made in the context of *tort*-law conflicts.  *Schultz*, 480 N.E.2d 679, 682 (N.Y. 1985) ("The choice-of-law question presented . . . is whether New York should apply its law in an action involving codomiciliaries of New Jersey when tortious acts were committed in New York."); *see GlobalNet*, 449 F.3d at 384 (explaining that under *Schultz*, "torts are divided into two types").  Likewise, the Second Circuit's application of this distinction in *Caruolo* was in the tort-law context and distinguished *Schwimmer*, a contract-law case where the defendant had "consent[ed] to the application of New York law to the determination of liability." *Caruolo*, 226 F.3d at 59.  Thus, there is no reason to construe New York law as deviating from the Second Restatement's rule on this point.

There is no dispute here that the insurance policies validly adopted New York law to govern their interpretation.  Indeed, both parties relied on the choice-of-law clause for the determination of Defendants' liability under those policies.  Therefore, applying the conflict-of-laws rule of the state in which this Court sits, the Court determines that New York substantive

law is applicable to the determination of prejudgment interest because it is the same as the law

the parties chose to govern the interpretation of the insurance policies.

### 2.     Interest Began to Accrue on July 24, 2007

New York law provides that the prevailing party in a breach of contract dispute is entitled

to prejudgment interest, to "be computed from the earliest ascertainable date the cause of action

existed." N.Y. C.P.L.R. § 5001(a)–(b). The statute "grants courts wide discretion in determining

a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co., Inc.*, 16

F.3d 504, 512 (2d Cir. 1994). In contract actions, the task is to ascertain the date of the breach.

*Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs.*, 692 N.E.2d 551, 553 (N.Y. 1998);

*Katzman v. Helen of Troy Texas Corp.*, No. 12-CV-4220, 2013 WL 1496952, at *7 n.3

(S.D.N.Y. Apr. 11, 2013). Where the contract is an insurance policy providing that the insurer

will make payment within a certain time after the insured submits a proof of loss, the date when

payment is due is an "ascertainable date" for the existence of a cause of action. *E.g.*, *10 Park

Square Assocs. v. Travelers Ins. Cos.*, 288 A.D.2d 828, 830 (App. Div. 4th Dep't 2001). But

when an insurer disclaims liability, that is also an "ascertainable date" for the insured's cause of

action. *See State Farm Ins. Co. v. Domotor*, 266 A.D.2d 219, 220 (App. Div. 2d Dep't 1999)

("An insurance carrier may not, after repudiating liability, create grounds for its refusal to pay by

demanding compliance with proof of loss provisions of the policy.").

Interest continues to accrue in contract cases until "the date the verdict was rendered or

the report or decision was made," and then "the total sum awarded, including interest to verdict,

report or decision," accrues additional interest from that date until "the date of entry of final

judgment." N.Y. C.P.L.R. §§ 5001(c), 5002. Whether a court's summary judgment order

represents a "verdict, report or decision" depends on whether it "represented the point at which

'plaintiff's right to be compensated for the damages [it] sustained bec[a]me[ ] fixed in law.'"

*Zhejiang Tongxiang Imp. & Exp. Corp. v. Asia Bank, N.A.*, 352 F. Supp. 2d 469, 471–72

(S.D.N.Y. 2005) (quoting *Love v. State*, 583 N.E.2d 1296, 1298 (N.Y. 1991)).   That point is

generally the "date that liability is established, even though the damages [determination] is

reached at a later time."   *Van Nostrand v. Froehlich*, 844 N.Y.S.2d 293, 296 (App. Div. 2d Dep't

2007).   In other words, for purposes of § 5002, the "decision" is "made" when "the sole

remaining question to be answered was the amount of money that defendant owed plaintiff."

*Zhejiang*, 352 F. Supp. 2d at 472.   At that point, the interest in effect compounds because

subsequent interest accrues on the total obligation owed, including interest that had accrued until

then.   *See* David D. Siegel, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 7B,

C.P.L.R. § 5003.   Otherwise, the obligation accrues simple, noncompounding interest at the

statutory rate of nine percent.   *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998)

(citing N.Y. C.P.L.R. § 5004).

    Here, Defendants disclaimed liability for the business interruption loss during the

Disputed Period at least three times.   The first such denial for which evidence has been submitted

occurred on July 24, 2007.   That is the earliest ascertainable date on which Plaintiff's cause of

action existed, and therefore prejudgment interest shall be calculated as beginning on that date.

Because the Court's July 30, 2012 summary judgment order left only damages to be calculated,

it constitutes a "decision" that ends the period during which interest accrues under N.Y. C.P.L.R.

§ 5001(c) and begins under § 5002.   Accordingly, "the total sum awarded, including interest" to

that date, shall accrue additional interest until "the date of entry of final judgment."   N.Y.

C.P.L.R. § 5002.   Therefore, nine percent annual prejudgment interest on Plaintiff's liability

began to accrue on July 24, 2007, compounded on July 30, 2012, and will end on the date the

Clerk enters final judgment.

The parties' proffered dates of accrual are incorrect. Plaintiff is wrong that interest began to accrue when the generator was returned to service. That may be when Plaintiff realized damages to its generator, but it is not when it had a cause of action for breach of contract against the Defendant insurers. That occurred only when Defendants disclaimed liability for Plaintiff's claims for the damage. Likewise, Defendants are wrong that the date of proof of loss determines the beginning of the accrual of interest. That determination was rendered moot when Defendants denied Plaintiff's claim, thus giving it a cause of action for breach of contract.

## CONCLUSION

The sum of Plaintiff's unindemnified repair costs for the generator and its business interruption loss is $3,404,347.91. The Court GRANTS summary judgment to Plaintiff for that amount, plus prejudgment interest to be calculated at the rate of nine percent per annum to run from July 24, 2007, to be compounded once on July 30, 2012, and to end on the date of entry of final judgment.

There is one issue remaining for disposition before entry of final judgment. Plaintiff asserts in its damages submission that Defendants' liability is to be apportioned among them according to certain percentages. (Pl.'s Op. Br. 13.) If there is no dispute as to those percentages, Defendants shall so stipulate. If not, the parties shall submit their respective positions to the Court by letter no later than November 15, 2013.

Dated: New York, New York
      October 𝓊 , 2013

SO ORDERED

PAUL A. CROTTY
United States District Judge

15